FILED
05/08/2024
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2024

**IN RE ALLISON S.**

**Appeal from the Juvenile Court for Hamilton County**
**No. 304950   Robert D. Philyaw, Judge**

_____

**No. E2023-01072-COA-R3-PT**

_____

This appeal concerns a petition to terminate the parental rights of a mother to her young daughter.  The trial court found by clear and convincing evidence that three grounds for termination existed as to Mother: (1) persistent conditions; (2) substantial noncompliance with a permanency plan; and (3) failure to manifest an ability and willingness to assume custody or financial responsibility.  The trial court also found that termination was in the best interest of the child.  The mother appeals.  We reverse the trial court's finding that clear and convincing evidence established the ground of substantial noncompliance with a permanency plan.  However, we affirm its findings that the remaining grounds were proven and that termination was in the best interest of the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Robin Ruben Flores, Chattanooga, Tennessee, for the appellant, Kayla W.

Jonathan Skrmetti, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I.   FACTS & PROCEDURAL HISTORY

This matter involves a petition to terminate the parental rights of Kayla W.

("Mother") to her daughter Allison S.[1]  The Department of Children's Services ("DCS") first became involved with the family in May 2021.  DCS received a referral originating from a 911 call concerning allegations of sexual abuse against the five-year-old child by a relative.[2]  A DCS case manager responded to the referral and arrived at the motel where Mother resided with the child and her relatives.  At the motel, Mother disclosed to the case manager that she used THC.  The case manager observed that Mother was lethargic and had decayed teeth.  Additionally, a relative reported that Mother was lethargic earlier in the week, and this report prompted the case manager to request a drug screen.  Mother consented to a urine drug screen and tested positive for methamphetamine, amphetamines, ecstasy, and THC.  DCS subsequently filed a petition in the juvenile court alleging that the child was dependent and neglected and requesting the court to award temporary legal custody of the child to DCS.  That same day, the juvenile court entered a protective custody order finding probable cause to believe that the child was dependent and neglected and awarding temporary legal custody to DCS.  Mother waived the preliminary hearing, and the juvenile court ordered Mother to pay fifty dollars per month in child support.  Thereafter, in October 2021, the juvenile court magistrate adjudicated the child dependent and neglected and ordered that the child remain in DCS custody.

In July 2021, DCS developed the first permanency plan, which was ratified by the juvenile court in August 2021.  The plan included a statement of responsibilities for Mother, which required her to consent to random drug screens by DCS, complete an alcohol and drug ("A&D") assessment, follow all recommendations from the A&D assessment, and provide the DCS case worker with a certificate of completion of an A&D program.  Additionally, anyone over the age of eighteen who resided with Mother was required to consent to random drug screens by DCS.  To maintain the bonded relationship between Mother and the child, the plan also required Mother to attend regular visitation, to give a twenty-four hour notice if a visit could not be attended, and to not attend visits under the influence.  The statement of responsibilities further required Mother to attend all court hearings and Child and Family Team Meetings, inform the case worker of changes to phone number or address, and have consistent conversations with the case worker.  Mother was also required to attend parenting classes and provide a certificate of completion.  Regarding Mother's housing situation, the plan required her to maintain housing for a minimum of six months, to ensure that utilities were on, and to provide the case worker with documentation of a lease or deed.  The statement of responsibilities further required Mother to complete a mental health assessment and follow all recommendations and to provide DCS with proof of a legal, verifiable income.

In August 2022, DCS developed a second permanency plan with a revised statement of responsibilities.  The statement of responsibilities required Mother to participate in

---

[1] In order to protect the privacy of the children involved, it is this Court's policy to use the first names and initials of the parties and children.

[2] These allegations of sexual abuse were never determined to be substantiated.

counseling to address her trauma and underlying issues of drug use. Additionally, Mother was required to sign releases of information so that DCS could communicate with her mental health service provider, to be compliant with her medication management, and to submit to random pill counts. At the discretion of the child's therapist, Mother was further required to participate in the child's therapy. To address concerns with Mother's housing situation, the plan required Mother to obtain housing that was free from drugs, domestic violence, criminal activity, infestation, clutter, or debris that would put the child at risk of harm and to provide proof of the residence to DCS. Likewise, Mother was required to refrain from associating with known drug users and criminals or participating in abusive relationships, and any person over the age of eighteen years old in her home would be subject to background checks and random drug screening. The statement of responsibilities also required Mother to resolve her legal issues and not accrue new charges. Mother was required to provide proof of employment, maintain contact with DCS, and attend all court hearings and team meetings. To address concerns with visitation, the plan required Mother to arrive thirty minutes early for every visit, notify the case worker or DCS transporter twenty-four hours in advance if she needed to miss or reschedule a visit, bring healthy snacks for the child, and not bring excess toys or clothing for the child to take to the foster home. The juvenile court ratified this permanency plan in November 2022.

In November 2022, DCS filed a petition in the juvenile court to terminate Mother's parental rights to Allison, alleging the following grounds: (1) persistent conditions; (2) substantial noncompliance with a permanency plan; and (3) failure to manifest an ability and willingness to assume custody or financial responsibility.[3] DCS further alleged that it was in the best interest of the child for Mother's parental rights to be terminated. The petition was heard over three days in April and June 2023. The court first heard testimony from Mother. Mother testified concerning her relationship with her husband, whom she had recently married. She met her husband while Allison was a baby, but she "re-met" him and began the relationship in December 2022. She married her husband in February 2023. When questioned about her husband's background, Mother stated that she knew that he had some previous drug charges when he was younger and that he had a case concerning domestic violence against his brother, but he did not have any current charges pending. She did not know, however, whether he had a history with DCS. She recalled telling Allison about her marriage at the end of February or the beginning of March 2023. She said that Allison seemed excited about it.

Regarding her history with drug abuse, Mother testified that she tested positive for methamphetamine and amphetamines during her first visit with Allison in August 2021. Later in the month, she submitted to another drug screen and tested negative for all substances. Mother also recalled testing positive for methamphetamine in January, March, June, July, August, and September 2022. Additionally, Mother admitted to testing positive

---

[3] The petition also concerned the parental rights of Allison's father. The trial court ultimately ordered that the father's parental rights be terminated. The father did not appeal.

for marijuana in July 2022. Although she tested positive for benzoylecgonine and cocaine in June 2022 and for cocaine in July 2022, she denied using these drugs. Mother stated that she had participated in an online outpatient substance abuse treatment program in September and October 2021; however, she began using drugs again at the end of October 2021. Mother further testified that she finally entered an inpatient treatment program for "detox" at CADAS[4] in November 2022. She completed the inpatient treatment in December 2022 and was recommended an intensive outpatient program ("IOP"). She started the IOP in January 2023 and was still working on the IOP at the time of trial. Since she was released from CADAS, Mother had tested negative on drug screens.

Mother also testified that she was diagnosed with bipolar disorder, anxiety, and posttraumatic stress disorder. Mother stated that she completed a mental health assessment in April or June 2022 and was recommended individual therapy and medication for bipolar disorder. She started taking the medications, but she did not start individual therapy at that time. However, she quit taking her medications in July 2022 because she did not like the way they made her feel. At one point, Mother stated that she started taking her prescribed medications again for the bipolar disorder and depression in January or February 2023. However, Mother later stated that she began taking her medications in November 2022. She also began going to therapy after she left the inpatient substance abuse treatment program in December 2022.

Concerning her housing situation, Mother testified that at the time Allison was removed, Mother and Allison were living with relatives in a motel because they were looking for a place to move. By April 2022, Mother was still residing at the motel. She submitted an application to move into "Section 8 housing,"[5] but she was not successful at

---

[4] CADAS is the "Council for Alcohol & Drug Abuse Services[.]" *In re Riley W.*, No. E2017-01853-COA-R3-PT, 2018 WL 1256222, at *1 (Tenn. Ct. App. Mar. 12, 2018).

[5] "Section 8 housing" refers to housing that is part of a federal program described as follows:

In 1974, Congress amended the United States Housing Act of 1937 (Housing Act) to create what is known as the Section 8 housing program. Through the Section 8 program, Congress hoped to "aid low-income families in obtaining a decent place to live," 42 U.S.C. § 1437f(a) (1988 ed., Supp. III), by subsidizing private landlords who would rent to low income tenants. Under the program, tenants make rental payments based on their income and ability to pay; the Department of Housing and Urban Development (HUD) then makes "assistance payments" to the private landlords in an amount calculated to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD. As required by the statute, this contract rent is, in turn, to be based upon "the fair market rental" value of the dwelling, allowing for some modest increase over market rates to account for the additional expense of participating in the Section 8 program. *See* § 1437f(c)(1).

*State, Dep't of Children's Servs. v. Puryear*, No. W2004-02878-COA-R3-PT, 2005 WL 735038, at *6 n.2 (Tenn. Ct. App. Mar. 30, 2005) (quoting *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 12, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993)).

finding a place to move.  By August 2022, however, Mother was homeless and was living with friends.  After completing inpatient treatment at CADAS in December 2022, she moved in with her current husband and his family, where she remained at the time of trial.  At that home, she did not have a bedroom for Allison, but she stated that she and her husband were working on adding a room.  When questioned about whether she was concerned about Allison potentially living with her husband and her husband's family, she admitted that she was a little concerned because Allison did not know them.  However, she stated that she did not think it would be an issue.

Mother also testified about her criminal history. In September 2021, she was arrested in East Ridge for possession of methamphetamine.  She was arrested again in January 2022 for failure to appear.  She pleaded guilty to the possession charge and received a "11/29 suspended sentence."  Mother testified that she was on probation for possession, and she was arrested for a probation violation in January 2023.  Mother's husband bonded her out, and she was only incarcerated for one day.  In January 2022, there was also a warrant for her arrest in Georgia for failure to appear on a shoplifting charge.  She was incarcerated in Georgia, and she pleaded guilty to the shoplifting charge in February 2022.  She was sentenced to twelve months on probation.  Mother also testified that all her criminal matters were resolved, and she was not on probation at the time of trial.

Mother further testified about her relationship with Allison. Mother stated that she and Allison had a good relationship and that Allison loves her and wants to be with her.  However, she admitted that her limited visitation and contact with her had affected their relationship "a little bit."  Mother stated that she attended most, if not all, the visits with Allison, but she was often late for visits due to issues with riding the bus.  She further stated that the visits she missed were due to her being incarcerated or in treatment.  When questioned about some of Allison's behavioral issues in the foster home, Mother said that she believed that she could be there to talk to Allison and help her get in a better place.  Mother testified that she thought that she was ready for Allison to return home, and she was not concerned about whether she was equipped to deal with Allison's behavioral issues because she planned on continuing her therapy and because she had a support system in her family to help her.

On the last day of trial, Mother participated in redirect examination telephonically.  During her testimony, Mother was located at the probation office because her husband came in for a drug test and was arrested.  Mother stated that her husband was on probation for "something to do with an argument with his brother."  She expressed concern about her husband's failure to comply with the terms of his supervised probation, but she did not know the results of her husband's drug screen.  However, Mother stated that there were "no drugs or anything going on" in the house where they lived.

Next, the court heard testimony from Kimberly Ash, a family services worker from

DCS. She began working on the case in September 2021. Ms. Ash testified that Mother was not consistent in attending visitation and was late to visits several times. She also expressed concern about Mother's behavior at the visits. She characterized the visits as "Santa Claus visits," where Mother would bring many snacks and Allison would "eat and eat." She remembered having a conversation with Mother about bringing healthier snacks and about not being on her phone during the visits. Ms. Ash stated that the visits had gotten "a little better." She said that at the first visit, Allison did not act like she "cared who momma was." Ms. Ash opined that the visitation had not cultivated a positive relationship between Mother and the child because the visits were merely "fun and games." According to Ms. Ash, Allison "dictate[d] things in the visits," and Mother would "give[] in to Allison a lot." She further testified that although Allison loves her mother, she often gets frustrated with her.

Regarding Mother's compliance with the permanency plan, Ms. Ash testified that she had discussed the responsibilities of the permanency plan with Mother. According to Ms. Ash, before Mother entered inpatient treatment, she completed almost nothing on the permanency plan. Mother's housing was unstable. She did not consistently visit Allison, and she was still "in and out" of jail. Although she had completed an IOP with the previous case worker, Mother was still testing positive on drug screens. After Mother entered inpatient treatment in November 2022, however, Mother had completed another IOP, and she was receiving mental health treatment. She also completed parenting classes and was employed. However, Ms. Ash expressed concern about Mother's housing situation at the time of trial. Ms. Ash stated that because it was not Mother's house and because she was not on the lease, she could be kicked out at any point. She never went to the home where Mother resided with her husband because there was not a bedroom for Allison and because she had been busy with duties in the cases she was managing. Ms. Ash further expressed concern about Mother's mental health and drug abuse issues. She did not know if Mother was compliant with her mental health treatment. Ms. Ash stated that she needed more consistency from Mother with her drug treatment, and she needed to know that Mother was mentally capable of consistently parenting Allison.

Concerning Mother's employment, Ms. Ash testified that Mother had worked sporadically during the case. At the time of trial, Mother was working in a fast food restaurant, and Ms. Ash described this job as the most consistent one that Mother had during the case. However, Ms. Ash stated that she had not received any pay stub showing that Mother was employed. She did receive, however, a "screen shot" from Mother's previous job. Ms. Ash also testified about her concerns with Mother's husband. She recalled running a background check on the husband based on the information that Mother gave her, and nothing came up for him. However, when she added an additional letter to his name, she found that he had a history with drugs and had "wav[ed] around a gun where there were kids present." She clarified that it did not appear that the husband had a history with DCS. Ms. Ash also stated that she questioned whether Mother intentionally kept information from her about the relationship. She further stated that because Mother had a

prior roommate who had an outstanding warrant and a lengthy criminal history, she questioned Mother's relationships and her judgment. She recalled that when she spoke to Allison about Mother's husband, Allison let Ms. Ash know that she was scared. According to Ms. Ash, Allison did not know the man, but she knew that other men had hit Mother. Ms. Ash also stated that Allison was scared for herself because she had been hit inappropriately and had interacted with Mother's former paramours.

The foster mother also testified. Allison had been in her home since August 2021. The foster mother described that when Allison first arrived at her home, she was "like the typical foster child" and was traumatized. She stated that Allison suffered from anxiety and missed her mother terribly. She was also afraid that she was going to get hurt. Allison would become upset and confused after phone calls and visits with Mother. Her anxiety was being addressed in individual therapy and had improved over time. However, the foster mother recalled that after Allison found out that Mother got married, she became confused and started worrying that someone was going to hurt Mother.

The foster mother further testified that Allison was developmentally delayed when she first arrived but had since made it to the next grade in school. The foster mother attributed this progress to Allison getting glasses after a diagnosis of a problem with her eyes. The foster mother testified that she and Allison had an established bond and "do well with one another." When asked if she was interested in adopting Allison, the foster mother stated that she was not sure about adoption and that she would still need to gather some more information about the process before she could make a decision. However, she believed that it would confuse Allison for her to be removed from the foster home. She further testified that Allison required stability and thrived in a routine and that she was able to provide that to the child.

The court also heard testimony from Felicia Nepp, a resource coordinator from Omni Visions, a contract agency of DCS. Ms. Nepp had been working on Allison's case since she first entered DCS custody. Ms. Nepp first testified about Allison's emotional progress in the foster home. When she entered foster care, Allison was not used to structure and did not have a set routine. In her first foster placement, she had difficulty adjusting to the daily routine, which would often result in Allison "screaming . . . trying to hit [her foster parents], hitting herself, [and] banging her head against the wall repeatedly." Ms. Nepp attempted to set up in-home therapy to address this behavior, but before she could arrange anything, the foster parents "decided to disrupt her." Allison was subsequently placed in her second foster home, where she resided at the time of trial. In her second foster home, Allison started school, which helped her get used to structure and routine. After Allison entered the second foster home, Ms. Nepp was able to arrange therapy for her, and the therapist started working with Allison to address her separation anxiety and childhood trauma. Ms. Nepp further stated that therapy had "worked wonders" and that Allison was getting mature and improving in her self-awareness and decision-making skills.

Ms. Nepp also testified concerning Allison's educational progress. Initially, Allison was behind in school. Due to her vision problems, she had difficulty reading. She had an individualized education plan (IEP) for speech and her vision, but she graduated from the speech portion. Ms. Nepp stated, however, that Allison was able to progress quickly and was meeting her developmental milestones as would be expected for her age. Additionally, Ms. Nepp testified that Allison's bond with Mother was very strong. She stated that it would be difficult for Allison if she did not go back to her mother because of the bond. Ms. Nepp further stated that Allison seemed fearful of Mother's new husband. She told Ms. Nepp, her foster mother, and her therapist that she was afraid that he might hurt her mother or hurt her. Ms. Nepp clarified, however, that Allison has never met Mother's husband and has only seen him once.

Concerning Allison's relationship with her foster family, Ms. Nepp testified that they had a strong bond and that Allison referred to her foster mother as "Mom" and her foster mother's daughter as her sister. Ms. Nepp further stated that it would be "extremely harmful" for Allison to be removed from her foster home because she is reluctant to change and is shy and skittish around new people. Additionally, Ms. Nepp expressed concern that Allison could possibly regress, but she further stated that staying with her foster mother and continuing in therapy would "make a big difference for her."

In June 2023, the trial court entered an order terminating Mother's parental rights. The court found that DCS had established the following grounds for termination of Mother's parental rights: (1) persistent conditions; (2) substantial noncompliance with a permanency plan; and (3) failure to manifest an ability or willingness to assume custody or financial responsibility. The court further found that termination was in the best interest of the child. Mother subsequently appealed.

## II.    ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have slightly restated:

1. Whether the trial court erred in allowing DCS to admit into evidence records that had no proper foundation for admission and improper testimony that was prejudicial to Mother and thus deprived Mother of a fair trial;
2. Whether performance of Mother's trial counsel was so wanting that Mother was deprived of the due process of law necessitating a review of the application of the effective assistance of counsel to termination of parental rights proceedings.

For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

### III. STANDARDS APPLICABLE TO TERMINATION CASES

It is well established that "[a] parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521-22 (Tenn. 2016) (collecting cases). "Parental rights have been described as 'far more precious than any property right.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 522). Despite being fundamental and constitutionally protected, however, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522 (citing *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010)). The decision to terminate a parent's rights to his or her child "has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or the guardian of the child." *Id.* (citing Tenn. Code Ann. § 36-1-113(l)). Thus, such a decision is one of the most serious decisions courts are called upon to make. *In re Mariah K.D.*, No. M2011-02655-COA-R3-PT, 2012 WL 3090313, at *6 (Tenn. Ct. App. July 30, 2012). Accordingly, "[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015) (citing Tenn. Code Ann. § 36-1-113(l)).

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *Id.* at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination as provided in section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interest of the child under the factors set forth in section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). It also "eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Due to the heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the trial court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure and presume each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard*

*T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.   DISCUSSION
### A.  Admission of Records

Mother first argues that the trial court erred in allowing DCS to admit into evidence records that "had no proper foundation for admission" and "were prejudicial to [Mother]."[6] Specifically, Mother states that the trial court improperly admitted numerous documents into evidence that purported to establish Mother's continued drug use and continued criminal history.

Mother did not object to the admission of any document at trial. Tennessee Rule of Appellate Procedure 36(a) provides, in part: "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The Advisory Committee Comment to this Rule clarifies that the above rule 'is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error.'" *In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *9 (Tenn. Ct. App. Oct. 21, 2015). This Court has previously explained:

> The contemporary objection rule is an elementary principle of trial practice. Parties who desire to object to the admission of evidence must make their objection in a timely manner and must state the specific basis for their objection. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). Parties cannot obtain relief on appeal from an alleged error they could have prevented. Tenn. R. App. P. 36(a). Therefore, failing to make an appropriate and timely objection to the admission of evidence in the trial court prevents a litigant from challenging the admission of the evidence on appeal. *Welch v. Bd. Of Prof'l Responsibility*, 193 S.W.3d 457, 464 (Tenn. 2006); *State ex rel. Smith v. Livingston Limestone Co.*, 547 S.W.2d 942, 944 (Tenn. 1977); *Ottinger v. Stooksbury*, 206 S.W.3d 73, 78 (Tenn. Ct. App. 2006).

---

[6] In her first issue statement, Mother also refers to "improper testimony" that was "prejudicial to [Mother] . . . ." However, she makes no argument that the trial court erred in "admit[ting] into evidence . . . improper testimony . . . ." As such, Mother has waived any issue concerning improper testimony at trial. *Little v. City of Chattanooga*, 650 S.W.3d 326, 353 (Tenn. Ct. App. 2022) (quoting *Sneed v. Bd. of Pro. Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010)) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

*Id.* (quoting *Levine v. March*, 266 S.W.3d 426, 440 (Tenn. Ct. App. 2007)). Because Mother did not object to the admission of the drug screens or criminal records, she has waived appellate review of this issue.[7] *In re Zoey O.*, No. E2022-00500-COA-R3-PT, 2023 WL 3222699, at \*6 (Tenn. Ct. App. May 3, 2023).

Nevertheless, even if this issue was not waived, DCS presented clear and convincing evidence beyond these documents to establish that Mother continued her drug use and had a criminal history. The admitted drug screens show that Mother tested positive for various substances between November 2021 and September 2022. Mother admitted to using methamphetamine, amphetamines, and marijuana during this period, and she further admitted to testing positive for these substances. The trial court likewise admitted documents concerning Mother's criminal record and arrests in East Ridge and Georgia. Mother testified concerning these arrests. Additionally, although one criminal record included an arrest for domestic violence and a "fugitive" arrest, the trial court made no findings pertaining to these arrests. Thus, any purported error in the trial court's admission of the drug screens and criminal records would be harmless "because the judgment is supported by alternative competent evidence." *In re Kandace D.*, No. E2017-00830-COA-R3-PT, 2018 WL 324452, at \*11 (Tenn. Ct. App. Jan. 8, 2018); *see In re Zoey O.*, 2023 WL 3222699, at \*6 ("[I]t is difficult to see how any error by the trial court in considering the failed drug screens as evidence indicating renewed drug use would be anything other than harmless given the significant other evidence beyond the drug screens indicating Mother's renewed use of drugs."). Therefore, we discern no reversible error with the admission of the drug screens and criminal records.

### B. Ineffective Assistance of Counsel

Mother also urges this Court to vacate the judgment and remand for a new trial on the basis that her counsel at trial was ineffective. In *In re Carrington H.*, our Supreme Court held that there is no constitutional right to effective assistance of counsel in parental termination cases. 483 S.W.3d at 535. Accordingly, "[t]here is no mechanism for [Mother] to seek relief from the termination of [her] parental rights based on ineffective assistance of counsel." *In re LaiLonnii J.*, No. E2018-01198-COA-R3-PT, 2019 WL 669758, at \*11 (Tenn. Ct. App. Feb. 19, 2019). Although Mother acknowledges the holding in *In re Carrington H.*, she asks this Court to "revisit the issue." The Supreme Court's holding in *In re Carrington H.* "is final and binding on this Court." *Id.* As such, Mother's argument is unavailing. *See In re Hailey C.*, No. M2016-00818-COA-R3-PT, 2017 WL 4331039, at \*5 (Tenn. Ct. App. Sept. 28, 2017) ("We decline Father's invitation to ignore the basic

---

[7] In her appellate brief, Mother argues that the admission of these exhibits "was outcome determinative and prejudicial to [Mother]'s defense and thus constituted plain error." However, as we discuss in the next paragraph, in light of the whole record, the admissions that Mother argues were made in error were harmless. *See In re Zoey O.*, 2023 WL 3222699, at \*6 n.3.

principles of *stare decisis*.").

## C.  Grounds for Termination

As previously discussed, the trial court found that the following grounds existed to terminate Mother's parental rights: (1) persistent conditions; (2) substantial noncompliance with a permanency plan; and (3) failure to manifest an ability and willingness to assume custody or financial responsibility.  Mother does not raise any issue on appeal regarding these grounds.  Nevertheless, we must review the trial court's decision as to grounds as well.  *See In re Carrington H.*, 483 S.W.3d at 511 (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").

### 1.     Persistent Conditions

The first ground for termination at issue is commonly referred to as "persistent conditions" or "persistence of conditions."  This ground applies when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3).  "A finding on the ground of persistence of conditions is not appropriate unless DCS presents clear and convincing evidence to establish each

statutory element." *In re B.A.C.*, 317 S.W.3d 718, 725 (Tenn. Ct. App. 2009) (citing *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006)). The purpose behind the ground of persistent conditions "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008). While the parents' efforts "are part of our analysis on substantial noncompliance with the permanency plan, the ground of persistent conditions focuses on whether the parent's efforts have been fruitful, i.e., whether the parent has remedied the conditions that led to the child's removal or whether those conditions will be remedied at an early date in the near future." *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *20 (Tenn. Ct. App. Sept. 14, 2012) (quotation omitted). "This ground for termination focuses on the *results* of the parent's efforts at improvement rather than the mere fact that he or she has made them." *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *17 (Tenn. Ct. App. Nov. 6, 2020) (citing *In re Abigail F.K.*, 2012 WL 4038526, at *20).

We begin by considering whether Allison had been "removed from the home or the physical or legal custody" of Mother "for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A). In June 2021, DCS filed a petition in the juvenile court alleging that the child was dependent and neglected. On the same day the petition was filed, the juvenile court entered a protective custody order finding probable cause to believe that Allison was dependent and neglected. The court then removed Allison from Mother's custody. When the trial began in April 2023, more than twenty-two months had passed from the time Allison was removed from Mother's home, which well exceeded the necessary period of six months for this ground. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B). Therefore, we determine that the requirement of the order of removal has been satisfied for this ground.

The conditions that led to the removal of Allison have persisted, and they prevent the child's safe return to Mother's care. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Allison was removed in part due to drug exposure. In the twenty-two months since Allison's removal, Mother had tested positive on several drug screens and admitted that she was "still using" as late as September 2022. We recognize that Mother has tested negative for drug use since her completion of the inpatient treatment program in December 2022, and we commend her for this; however, trial began in April 2023. Thus, she has not "exhibited an ability to refrain from drug use for a prolonged period of time outside of a controlled environment[.]" *In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *13 (Tenn. Ct. App. July 6, 2021). Although Mother completed an outpatient online substance abuse treatment program in October 2021, she started using drugs again shortly thereafter. Because Mother has a history of relapse after treatment, her sobriety after completion of the inpatient treatment program "does little to persuade us that she will continue her efforts in the future, in light of her previous treatment and relapse." *In re*

- 13 -

*Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *15 (Tenn. Ct. App. Aug. 20, 2020). The possibility of relapse outside of the controlled environment of an inpatient substance abuse program poses a significant risk of further abuse and neglect to the child and prevents the child's safe return to Mother's care.

With Mother failing to demonstrate that she could achieve lasting sobriety in the twenty-two months from when Allison was removed until the time of trial, it is unlikely that these conditions will be remedied at an early date. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii); *Dep't of Children's Servs. v. B.B.M.*, No. E2006-01677-COA-R3-PT, 2007 WL 431251, at *9 (Tenn. Ct. App. Feb. 9, 2007) ("Given that Mother has been unable to remedy these problems for many years, it is unlikely that these conditions would be remedied at any time in the near future."). The instability and uncertainty surrounding Mother's substance abuse issues stand in marked contrast to the stability and care that Allison has experienced in her foster home. Allison is closely bonded with her foster mother, and in her foster home, she has made great progress in her development and received necessary therapies and educational interventions. Although the foster mother testified that she was not sure if she would pursue adoption of the child, "placement of the [child] in a pre-adoptive foster home is not required to find that the final element of this ground for termination has been met . . . ." *In re James W.*, 2021 WL 2800523, at *14. Allison deserves permanence and stability, and the continuation of her relationship with her mother greatly diminishes her chances of being part of a "safe, stable, and permanent home" during her childhood. Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). We therefore conclude that there was clear and convincing evidence supporting this ground for termination.

### 2.      Substantial Noncompliance with a Permanency Plan

The next ground at issue is substantial noncompliance with a permanency plan. Permanency plans "are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care." *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). "This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children." *Id.* Therefore, a ground for termination exists when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan . . ." Tenn. Code Ann. § 36-1-113(g)(2). For this ground, the permanency plan responsibilities must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)). Conditions that necessitated foster care may "include conditions related both to the child's removal and to family reunification." *Id.* at 547. "Not every failure to comply with a permanency plan will constitute grounds for termination of parental rights." *In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *14 (Tenn. Ct. App. Dec. 22, 2020) (citing *In re Abigail F.K.*, 2012 WL 4038526, at *14). "Trivial, minor,

- 14 -

or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). The Tennessee Supreme Court has described this ground as follows:

> Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*In re Valentine*, 79 S.W.3d at 548-49.

As previously discussed, two permanency plans were created for Mother. The child was placed in DCS custody due in part to lack of supervision and drug exposure. We find that all of the responsibilities in the permanency plans were reasonable and related to remedying the conditions that led to the child's removal and family reunification.

We first consider Mother's compliance with the responsibilities regarding drug use. The first permanency plan required Mother to consent to drug screens by DCS, to complete an A&D assessment and follow all recommendations, and to provide the case worker with a certificate of completion. The second permanency plan required Mother to participate in counseling to address the underlying issues of drug use and to obtain housing that is free from drug use. Mother participated in drug screens throughout the case, and she completed an A&D assessment in March 2022, which recommended a full A&D assessment at CADAS. Mother completed the full A&D assessment through CADAS in August 2022. CADAS recommended that she enter inpatient treatment, but Mother refused at that time. In November 2022, Mother finally entered inpatient treatment. Since completing inpatient treatment, Mother has also participated in therapy, and she has not had any relapses or positive drug screens. Mother likewise testified that there were no drugs in her home, and DCS offered no evidence contradicting this statement. The record, however, is unclear concerning whether Mother submitted a certificate of completion from the A&D assessment to DCS. Considering all of the evidence, we conclude that Mother made efforts to meet most of the requirements concerning her drug use by the time of trial.

Concerning Mother's mental health, the first permanency plan required her to complete a mental health assessment and follow all recommendations. The second permanency plan required Mother to participate in counseling to address her traumas and

underlying issues of drug use, sign releases of information so that DCS could communicate with her service provider, and to be compliant with her medication management and submit to random pill counts. Mother completed a mental health assessment in April or June 2022. It was recommended that she participate in medication management and individual therapy, but she did not begin either immediately. However, Mother began taking her prescribed medications again, and she began individual therapy in December 2022. The court did not hear proof concerning whether Mother signed releases of information or submitted to random pill counts. Thus, Mother has complied with most of the responsibilities related to mental health.

The first permanency plan required Mother to attend regular visitation with the child, to provide a twenty-four hour notice if she could not attend a visit, and to "not attend the visits [under] the influence." The second permanency plan required Mother to arrive thirty minutes early for her visits, to notify the case worker or DCS transporter twenty-four hours in advance if she needed to miss a visit, and to bring healthy snacks to the visits. Additionally, Mother was required to not bring excess toys or clothing for Allison to take to the foster home. Mother admitted that she was often late to most visits due to issues with the bus schedule. Mother often brought unhealthy food to the visits. Ms. Ash testified that Mother had not visited consistently and was late to many visits, but Ms. Nepp testified that in the visits she was responsible for supervising, Mother had consistently attended and been on time. Although Mother admitted that she was often late to visits, it is unclear how many times Mother was late and whether Mother consistently attended visitation. Accordingly, there is simply insufficient evidence in the record for us to conclude by clear and convincing evidence that Mother was substantially noncompliant with the visitation requirements.

Regarding Mother's income and employment, the first permanency plan required Mother to provide DCS with proof of a legal, verifiable income. The second permanency plan required her to provide proof of employment to DCS. Mother failed to submit proof of employment or income except for a screen shot from one employer whom she worked for around April 2022. Nevertheless, Ms. Ash testified that at the time of trial, Mother was working in a fast food restaurant. Overall, Mother partially complied with the responsibilities regarding income and employment.

The first permanency plan also required Mother to attend court hearings and team meetings, to inform the case worker of any phone number or address changes, and to have consistent conversations with the case worker. This responsibility was absent from the second permanency plan. The record is devoid of proof concerning Mother's record of attendance at team meetings and court hearings. Ms. Ash testified that Mother had difficulty maintaining contact with her. However, Ms. Ash also testified that she had contact with Mother consistently when she was available. Thus, the consistency of Mother's communications with Ms. Ash and Mother's participation in the case are not readily apparent from the record. The first permanency plan also required Mother to

complete parenting classes and provide a certificate of completion. Mother complied with this responsibility.

The statement of responsibilities for the first permanency plan required Mother to "maintain housing for a minimum of six months and provide [the case worker] documentation of [a] lease or deed" and to "ensure that utilities are on at all." The second permanency plan required Mother to "obtain housing that is free from drugs, domestic violence, criminal activity, infestation, clutter, or debris that would put Allison at risk of harm" and to provide proof to DCS. Up until December 2022, Mother either resided in hotels or was homeless, but after she completed the inpatient treatment program, Mother began living in a home with her husband and her husband's family. Mother's compliance with the stated responsibilities concerning housing is also unclear. Despite Ms. Ash's concerns about the suitability of the home, she did not have an opportunity to go to the home. Therefore, no evidence was produced at trial concerning whether the home had any conditions that would be unsafe for Allison. Considering the lack of proof on whether Mother's housing at the time of trial met the specific requirements of the permanency plan, we do not find that Mother was substantially noncompliant with this responsibility.[8]

The second permanency plan also required Mother to "refrain from associating with known drug users and criminals or participating in abusive relationships." As Mother testified, her husband was on probation for "something to do with an argument with his brother," and he was arrested during the trial for violation of his probation. Ms. Ash also testified that she did a background check on the husband, and he had a history of drug use and had "waiv[ed] around a gun where there were kids present." Ms. Ash spoke to the husband, and he said that his charges were around nine years ago, but he was currently on probation. While we recognize that these facts about the husband's background are concerning, the nature of his probation and whether he continued in his criminal activity are unclear. There was no evidence that this was an abusive relationship. Thus, DCS did not establish by clear and convincing evidence that living with the husband amounted to substantial noncompliance with the permanency plan.

The statement of responsibilities in the second permanency plan also required Mother to "resolve her legal issues and not accrue new charges." As previously discussed, Mother testified that she was arrested for possession of methamphetamine, and she was

---

[8] In its appellate brief, DCS argues that Mother was substantially noncompliant due in part to her failure to "obtain stable housing" and her failure to have a bedroom for the child. However, obtaining *stable* housing with a bedroom for the child was not expressly included in the statement of responsibilities in the revised permanency plan. By failing to include these items in the designated "Statement of Responsibilities," DCS did not clearly communicate by the permanency plan that Mother must obtain *stable* housing with a bedroom for Allison in order to gain custody of the child. *See In re Jaylan J.*, 2020 WL 7861378, at *20. Thus, in analyzing this ground, we do not consider whether Mother's housing was stable or whether the home had a bedroom for Allison to determine whether she was in substantial noncompliance "with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2).

arrested for failing to appear on the possession charge, was arrested for violation of probation, and was incarcerated in Georgia on a shoplifting charge. Mother further testified that she had resolved her legal issues by the time of trial. However, when Mother was later questioned about whether she was on probation, Mother responded, "I had a thing, but it's not supervised or anything. I don't even know if it's probation. They just said if I didn't get in any trouble in six months, it would be dropped." This testimony raises uncertainty concerning whether or not Mother had complied with this responsibility by the time of trial. Due to the lack of clarity on this issue, DCS did not establish by clear and convincing evidence that Mother failed to resolve her legal issues.

We note that many of the responsibilities were completed by Mother after the petition was filed in November 2022. In some circumstances, we have held that a parent's efforts to complete permanency plan requirements after the petition for termination was filed were "too little, too late" to avoid this ground for termination. *See In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *7 (Tenn. Ct. App. Aug. 15, 2023); *In re Madux F.*, No. E2019-01535-COA-R3-PT, 2020 WL 1893646, at *14 (Tenn. Ct. App. Apr. 16, 2020) (quoting *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *10 (Tenn. Ct. App. Apr. 14, 2005)) ("This 'too little, too late' concept is often used to describe parents who, despite having an abundance of time and resources, wait until shortly before their termination hearing and then hurriedly try to comply with the obligations in their permanency plans."). "However, unlike the ground of abandonment, there is no indication in the statute defining substantial noncompliance that efforts made after the filing of the petition do not remedy prior inactivity." *In re Jordan P.*, No. E2022-00499-COA-R3-PT, 2023 WL 2770680, at *10 (Tenn. Ct. App. Apr. 4, 2023) (citing Tenn. Code Ann. § 36-1-113(g)(2)). Additionally, for this ground, "[i]mprovements in compliance are construed in favor of the parent." *Id*. (citing *In re Abbigail C.*, 2015 WL 6164956, at *20).

Overall, "we cannot say that [Mother] is in substantial noncompliance for having done 'too little.'" *Id.* Mother has made significant efforts in addressing her drug abuse and mental health issues, and she has completed most of the responsibilities related to these concerns. Mother also secured employment, and she has completed the responsibility regarding parenting classes. We recognize that Mother has failed to provide proof of housing and employment, has failed to show up to visits on time, and has failed to bring healthy snacks to the visits. However, when considering Mother's efforts, the record does not clearly and convincingly establish that her noncompliance with the permanency plan was substantial. *See, e.g.*, *In re Valentine*, 79 S.W.3d at 549 (reversing this ground where the parent had stable housing, attended parenting classes, and partially complied with the visitation requirement, but did not comply with requirements of attending individual counseling and undergoing a neuropsychiatric evaluation). Moreover, many aspects of Mother's compliance with the permanency plan requirements are unclear from the record. "[T]he clear and convincing standard requires that 'any serious or substantial doubt about the correctness of these factual findings' be eliminated." *In re Jordan P.*, 2023 WL

2770680, at *11 (quoting *In re Carrington H.*, 483 S.W.3d at 522)). The evidence in the record does not satisfy this standard. *See id.* ("Although it is a close call, the evidence before us simply does not rise to this level."). Accordingly, we reverse the trial court's finding that DCS proved this ground by clear and convincing evidence.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

The final ground for termination is failure to manifest an ability and willingness to assume custody or financial responsibility. This ground exists when:

> A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child . . .

Tenn. Code Ann. § 36-1-113(g)(14). There are two prongs necessary to prove for this ground: "(1) the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Our supreme court has explained that the first prong "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if the petitioner "seeking to terminate parental rights proves by clear and convincing proof that a parent . . . has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). A parent's ability is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (quoting *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018)). A parent demonstrates willingness, on the other hand, "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.* (citing *In re Ayden S.*, 2018 WL 2447044, at *7).

As for the second prong, a court "examines the effect that placing the child in the parent's custody would have on the child—namely, whether the parent's assumption of custody would present 'a risk of substantial harm to the physical or psychological welfare of the child.'" *In re Sylvia H.*, No. E2020-01009-COA-R3-PT, 2021 WL 1098630, at *7 (Tenn. Ct. App. Mar. 23, 2021) (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

First, we address Mother's ability to assume custody for the child. Although we recognize that Mother had not tested positive for drugs since she left the inpatient treatment program, her issues with substance abuse remain a significant concern, and she has not demonstrated that she can achieve lasting sobriety outside of the structure of a substance abuse treatment program. Likewise, although Mother testified that she resolved her legal issues, Mother has a significant criminal history, and she was arrested as recently as January 2023. Thus, both Mother's lifestyle and circumstances demonstrated that she did not have the ability to assume custody of the child.

Second, we address whether placing the child in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14). We have described this element as follows:

> [T]he use of the modifier 'substantial' indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). "[P]arents with a significant, recent history of substance abuse . . . could lead to a conclusion of a risk of substantial harm." *Id.* We have also previously found a risk of substantial harm where the parent has not obtained stable housing. *In re Daisy A.*, No. E2019-00561-COA-R3-PT, 2020 WL 1899606, at *9 (Tenn. Ct. App. Apr. 17, 2020) ("The evidence clearly and convincingly establishes that Mother does not have a stable housing situation and that her history of drug use and her decision to live with someone who smokes marijuana on a daily basis pose a risk of substantial harm to Daisy's physical and psychological welfare."). Due to Mother's significant history of drug use and her unstable housing situation, we agree with the trial court's finding that placing the child in Mother's custody would pose a risk of substantial harm to the child's physical and psychological welfare. Accordingly, we conclude that there was clear and convincing evidence supporting this ground for termination.

### D. Best Interest of the Child

We now turn to address whether the trial court erred in finding that it was in the best interest of the child to terminate Mother's parental rights. Our supreme court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861).

- 20 -

"After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017). The twenty statutory best-interests factors are:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). "When considering the factors [above], the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). For our review of these factors, because evaluation of these factors often involves discussion of similar issues, we combine our discussion of these factors "based on the overarching themes within the list of twenty factors." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We begin by addressing the child's needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning a child's need for stability), (B) (concerning how a change in caretaker would affect a child's well-being), (D) (concerning the attachment between the parent and child), (E) (concerning visitation between parent and child), (H) (concerning the child's parental attachment with individuals other than the parent), and (T) (concerning the effect of the parent's fitness on the child). Allison needs stability and a routine. Mother, however, has failed to demonstrate that she can provide this to her. Furthermore, Mother's instability and relationships with men have had a negative effect on Allison's emotional well-being. Although there is a strong bond between Mother and Allison, there was not a secure and healthy attachment between them, and Ms. Ash testified that the child's bond to Mother was more like a bond to "her friend [or] her big sister." Mother's visitation has been ineffective at cultivating a positive relationship. Due to Mother's extensive history of drug use and mental health issues, it is likely that Mother's emotional fitness would prevent her from consistently and effectively providing safe and stable care and supervision

- 23 -

to Allison. Although the child had initially been in another home after she was removed from Mother, her foster mother has continuously provided her with stable home since August 2021. She has a strong bond with her foster mother and the foster mother's daughter. Therefore, we find that these factors weigh in favor of termination.

Next, we address the factors pertaining to Mother's home. *See* Tenn. Code Ann. § 36-1-113(i)(1)(F) (concerning whether the child is fearful of living in the parent's home) and (Q) (concerning the parent's commitment to maintaining a home that meets the child's needs). Although there was no indication that Allison is fearful of living with Mother, she was very fearful of Mother's husband, and she expressed that "she was afraid that he might hurt [Mother] or hurt her." Mother has not shown a commitment to maintaining a home that meets the child's needs, as the home did not have a separate bedroom for Allison. Therefore, we find that these factors weigh in favor of termination.

We now consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (concerning the parent's demonstration of continuity and stability in meeting the child's needs), (J) (concerning the parent's lasting adjustment of circumstances), (K) (concerning the parent's use of available programs, services, or community resources), (L) (concerning DCS's efforts), (M) (concerning parent's sense of urgency), and (P) (concerning the parent's understanding of the child's needs). Although DCS made reasonable efforts to assist Mother by developing and reviewing permanency plans as well as routinely contacting her to check on her progress, Mother was slow to take advantage of many of the resources offered to her to effect lasting change. After the termination petition was filed, however, Mother made significant efforts to address her drug abuse and mental health. Nevertheless, she has not demonstrated that she can remain sober and make long-term progress with mental health outside of the structure of a treatment and therapy. By her failure to urgently address the barriers to reunification, Mother has also not demonstrated an understanding of the child's needs. We therefore find that these factors weigh in favor of termination.

Considering factor (S), Mother has occasionally paid child support. However, as previously discussed, Mother did not start paying child support until June 2022. Even then, her payments were inconsistent and were never the full fifty dollars per month as ordered by the juvenile court. Therefore, we find that this factor weighs in favor of termination.

Finally, we address factors (G), (I), (N), (O), and (R). While Allison has been "somewhat fearful of men," and has experienced anxiety concerning her Mother's husband, it is unclear whether the husband, Mother, or anyone else in Mother's home would trigger or exacerbate Allison's experience of trauma. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G). There was testimony that Allison developed relationships with her foster mother's daughter and extended family, but the trial court did not hear any testimony regarding the likely impact of various available outcomes on these relationships or the child's access to information about her heritage. *See* Tenn. Code Ann. § 36-1-113(i)(1)(I). Although there

were allegations that the child was sexually abused by a relative, these claims were not substantiated, and there is no indication that this relative currently resides in or frequents Mother's home. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N). There is also nothing in the record that speaks to whether Mother ever provided safe and stable care for Allison or any other child. *See* Tenn. Code Ann. § 36-1-113(i)(1)(O). Finally, although Ms. Ash expressed concern about the fact that Mother's home did not have a bedroom for Allison, the health and safety of the home is largely unknown. *See* Tenn. Code Ann. § 36-1-113(i)(1)(R). Therefore, we find these factors inapplicable in the present case.

In light of all of these statutory factors, there was clear and convincing evidence supporting the trial court's conclusion that termination of Mother's parental rights was in the best interest of the child. Therefore, we conclude that the trial court did not err in finding that termination of Mother's parental rights was in the best interest of the child.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the juvenile court in part, and we reverse in part. The case is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellant, Kayla W., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE